Alcala, J., filed a dissenting opinion in which Walker, J., joined.
In this application for post-conviction habeas relief filed by Julius Jerome Murphy, applicant, the habeas court never heard any live testimony from the two witnesses who are pertinent for the resolution of applicant's false-evidence claim. I, therefore, would remand this case to the habeas court for it to properly analyze applicant's claim based on a complete review of all the pertinent evidence, rather than, as this Court's majority does, deny applicant's claim based on the existing record that includes only written affidavits from those witnesses. Furthermore, because the parties and trial court had agreed that applicant's death sentence for capital murder should be reformed to a life sentence for murder and applicant had been relocated from death row into the general prison population, I conclude that this Court should address the merits of applicant's "Motion to Remand" this case, in which he challenges this Court's decision to disallow that reformation. Specifically, applicant alleges that it would violate the Eighth Amendment to re-impose his death sentence after the district attorney and the trial judge agreed to reform his sentence to life imprisonment. Because I conclude that applicant has presented a colorable argument that it would violate his constitutional rights to carry out his death sentence under these circumstances in which the State formerly agreed to reform his sentence to life imprisonment, I would consider that issue on its merits. I, therefore, respectfully dissent from this *253 Court's denial of relief as to applicant's false-evidence claim and its denial of his motion to remand.
I. Background
In 1998, applicant was convicted of capital murder and sentenced to death for the 1997 shooting of Jason Erie. The shooting took place during a robbery of the victim in a parking lot. Prior to the shooting, applicant had spent the evening drinking and partying with a group of friends. The friends eventually decided to go out to eat at a restaurant and left in two cars. At one point, the two cars pulled over at a gas station, and the driver of one of the cars, Chris Solomon, told the group he had noticed a man who was having car trouble and that he wanted to go "jack him." The driver of the other car, Javarrow Young, told Solomon that he was not interested because he had his child in his car. The group then split up. Young and several passengers drove to the restaurant. Applicant, along with his girlfriend Christina Davis and a woman named Maria Woods, rode in Solomon's car to the parking lot where the victim was working on his car. The group assisted the victim with jump starting his car. According to the trial testimony, Woods then took a gun out of the car's glove box and handed it to applicant. Applicant got out of the car, went to the passenger side of the victim's car, and told the victim to give him all his money. When the victim refused and got out of his car and came towards applicant, applicant shot him one time in the head. Applicant took the victim's wallet and the group left the scene.
After waiting at the restaurant for 15 to 30 minutes, Young and his companions left to look for Solomon's car, returning to the parking lot where the robbery had occurred, at which point they saw the victim lying on the ground. When police arrived around that time, Young gave them a false name, denying that he knew anything about the shooting. But a few days later, Young spoke to the police again and told them that his friends had committed the robbery. At trial, Young testified that police threatened to take his baby away from him and the baby's mother if he did not cooperate with the police.
Davis was eventually interviewed by police, and she later testified at trial. Initially, Davis told officers that Solomon shot the victim. Davis later gave a second statement in which she indicated that it was applicant who had shot the victim.
Applicant confessed to the crime in a written statement. Afterwards, when being booked into jail, applicant stated, "I bet y'all never had anybody stand up and say straight out that he killed" someone.
At trial, no physical evidence was presented linking applicant to this offense. The primary evidence against applicant was testimony from Davis and Young, along with his own written confession.
Following his trial, this Court affirmed applicant's conviction and sentence on direct appeal. Murphy v. State , No. AP-73,194 (May 24, 2000) (not designated for publication). In 2002, this Court denied relief on the initial post-conviction habeas application. See WR-38,198-02. And in 2014, this Court denied relief on the first subsequent application. See WR-38,198-03. This is applicant's second subsequent habeas application.
In his instant pleadings that were filed in 2015, applicant raised three grounds: (1) the district attorney's office failed to disclose threats of prosecution and promises of leniency to the State's two main witnesses, Davis and Young, as required by Brady v. Maryland , 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ; (2) the State unknowingly presented false testimony *254 through the testimony of Davis and Young in violation of Ex parte Chabot , 300 S.W.3d 768 (Tex. Crim. App. 2009) ; and (3) evolving standards of decency dictate that the death penalty is no longer constitutional. With respect to his first two claims, applicant relied on new affidavits from Davis and Young. Both witnesses' affidavits appear to indicate that, contrary to their testimony at trial, applicant was not the shooter but that Solomon had in fact shot the victim. Both witnesses indicated in their affidavits that they gave false testimony as a result of threats of prosecution by the State.
This Court determined that the first and second claims met the requirements for consideration in a subsequent writ application, and in 2016, we remanded those issues to the trial court for resolution on their merits. Ex parte Murphy , No. WR-38,198-04 (Tex. Crim. App. June 15, 2016).
Approximately one year later, in June 2017, this Court received a supplemental record from the trial court. The supplemental record contained documents indicating that, in May 2017, during the course of the litigation on remand, the parties had sought to enter into an agreement to reform applicant's conviction for capital murder to regular first-degree murder, and to reform his sentence from death to life imprisonment. After the parties reached this agreement, the State filed a "Motion to Dismiss the Indictment," in which the State asked the judge to dismiss the capital murder charge with prejudice, purportedly relying on the terms in Code of Criminal Procedure Article 32.02.[1] The trial court granted the State's motion and issued an order accepting the parties' agreement. The trial court also recommended dismissing the instant writ application as moot in light of the parties' agreement. In response to this development, this Court issued an order rejecting the parties' agreement and the trial court's dismissal of the indictment on the basis that, because only this Court has the ultimate power to determine whether habeas relief may be granted in this context, the trial court lacked jurisdiction to reform the death sentence until this Court had ruled on the merits of the habeas application and determined that a new trial was warranted.
In accordance with this Court's instructions to resolve the merits of applicant's habeas claims, the trial court subsequently held a hearing. At the hearing, neither Young nor Davis appeared, despite having been summoned to testify. According to the record, at the time of the hearing, Young was incarcerated in Huntsville on a felony assault charge. Applicant asserts that, based on instructions received from the clerk and constable, a subpoena for Young's appearance was served on TDCJ. However, because no bench warrant was issued for Young to appear, TDCJ did not transport him to the hearing. Davis did not appear because attempts to serve her in multiple locations failed.
Several witnesses, including applicant's trial counsel and the prosecutors, did testify. Applicant's trial counsel testified that the State did not inform him that Davis may face charges. Counsel said he met with Davis prior to trial and she did not mention any threats of prosecution or deals with the prosecution in exchange for her testimony. Counsel also testified that *255 he was unaware of any deals with Young. The defense team was aware that Young had been threatened with having his child taken away and focused on that fact during cross-examination at trial. Two prosecutors who had worked on the case also testified and indicated that the State did not disclose any threats or promises of leniency for Davis or Young because no such threats or promises were made.
Based on the evidence that had been introduced, the habeas court made findings of fact and conclusions of law recommending that all relief be denied. With respect to applicant's Brady claim, the habeas court found credible the prosecutors' testimony indicating that no threats of prosecution or deals were made for Davis and Young. With respect to applicant's false-evidence claim, the habeas court determined that the affidavits from Davis and Young were not credible, and, in any event, their new assertions were not material to a finding of guilt in light of applicant's confession to this offense.
In his current pleadings before this Court styled as a "Motion to Remand," applicant challenges the habeas court's refusal to require live testimony from the recanting witnesses to ascertain their credibility. The relevant witnesses, Davis and Young, did not appear to give testimony despite applicant's efforts to secure their testimony at the habeas hearing. Applicant complains that the trial court did not permit live testimony by Young, who did not appear because he was incarcerated in Walker County at the time of the hearing. Young was not transported to the hearing in Bowie County, nor was his live testimony permitted through live electronic communication. Davis could not be located and failed to appear for the hearing. Applicant has requested further opportunity to obtain their presence for live testimony at a habeas hearing before the habeas court.
II. This Case Should Be Remanded For a New Hearing with Testimony from Absent Witnesses
I would not adopt the habeas court's findings of fact and conclusions of law rejecting applicant's false-evidence claim at this juncture because the two most pertinent witnesses on that matter have yet to provide live testimony subject to cross-examination and full consideration by the habeas court. I conclude that a live hearing is needed to fully evaluate the credibility of Davis's and Young's assertions that applicant was not the shooter and, therefore, I would remand this case to the habeas court for live testimony. Although applicant's confession was admitted at his trial, the strength of that evidence must be weighed against the recanted testimony by Davis and Young to determine whether it would still support a finding of guilt and imposition of the death penalty under the reevaluated circumstances.
The importance of live testimony from these recanting witnesses in this case is a consequence of the evidence adduced at applicant's trial. At trial, the State's case primarily consisted of applicant's confession and these witnesses' testimony. As applicant contended at trial and reemphasizes in his instant application, no physical evidence shows that applicant shot the victim. Perhaps it could be argued, as the habeas court suggested, that applicant's false-evidence claim necessarily should fail in light of his written confession which renders these witnesses' recantations immaterial. However, I reject the notion that applicant's confession makes the instant litigation meaningless. Although applicant confessed to shooting the victim, applicant's habeas counsel points out that applicant's statement should be viewed with significant skepticism. As applicant's trial counsel noted, "For many reasons, especially *256 not very thoughtful ones and very well thought-out reasons, people are willing to take the blame for something they didn't do." The Supreme Court has recognized that the possibility of a false confession increases with intellectual disability, taking note of this fact as a rationale for exempting the intellectually disabled from capital punishment. See Atkins v. Virginia , 536 U.S. 304, 320, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). Given his prior habeas claims suggesting that he is intellectually disabled and that, at a minimum, he has below average intelligence and was intoxicated by alcohol and marijuana at the time of the offense, applicant's confession could potentially be an instance of falsely taking responsibility for another's actions. Thus, the importance of live testimony from the now-recanting witnesses who previously buttressed that confession cannot be overstated. Considering the lack of physical evidence and plausible reasons to possibly doubt the veracity of applicant's confession, due process and the right to a fair trial necessitate an opportunity to personally evaluate the recantations of these witnesses the State relied upon to support the veracity of applicant's confession. Moreover, while recognizing that applicant could possibly have been convicted of capital murder under a party-liability theory even if he was not the actual gunman, a jury might have reasonably concluded that someone who was not the actual gunman poses a lesser danger to society and would have concluded that a death sentence was inappropriate. Accordingly, I would remand this application to the habeas court for it to receive live testimony from Davis and Young.
III. Court Should Consider Constitutional Implications of Permitting Applicant's Execution Following Agreed Reduction of Sentence
In his motion to remand, applicant asserts that the reinstatement of his death sentence months after that sentence was lifted pursuant to the trial court's order accepting the parties' agreement to reduce his sentence to life imprisonment violates the Eighth Amendment. Applicant asserts that, at the time the agreement was entered into, both parties "believed in good faith that this plea agreement was valid." Applicant continues, "The victim's family agreed to this plea deal, the trial court accepted Murphy's plea, and dismissed the original indictment in June 2017. For months, Murphy's death sentence was lifted and he believed in good faith that he would not be executed .... To re-impose Murphy's death sentence now would subject Murphy to extreme psychological harm in violation of" the Eighth Amendment. Applicant contends that the Eighth Amendment may be violated by a punishment that imposes extreme psychological suffering. See Beal v. Foster , 803 F.3d 356, 357-58 (7th Cir. 2015) (the "alleged pain sufficient to constitute cruel punishment may be physical or psychological"). He asserts that forcing him to suffer the psychological trauma of having his death sentence imposed again, following the parties' collective good-faith belief that the State had the ability to dismiss and re-plead him to life imprisonment under these circumstances, is precisely the sort of "unnecessary and wanton infliction of pain" that the Eighth Amendment proscribes. See Gregg v. Georgia , 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). He further contends that re-imposing a death sentence following an agreed reduction of his sentence to life imprisonment renders his punishment arbitrary and capricious. See ids="6176749" index="11" url="https://cite.case.law/us/428/153/#p173">id. at 188, 96 S.Ct. 2909. He asserts that the Eighth and Fourteenth Amendments prohibit a state from inflicting "a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed." Id.
*257 At the outset, I continue to believe that, because only this Court may grant habeas relief, the trial court did not have the jurisdiction or authority to alone set aside applicant's death sentence and to permit applicant to be re-sentenced to life in prison for murder. But that does not resolve the instant pleadings that now contend that, having been re-sentenced to life in prison via an agreement with the State that that was the appropriate punishment for this offense, applicant's death sentence must not be re-imposed because doing so would violate his rights under the federal Constitution. That is a difficult and complicated question that is one of first impression in this Court. I would file and set that issue for further evaluation of whether the imposition of applicant's death sentence under these circumstances would constitute a cruel and arbitrary punishment in violation of the Eighth Amendment.
IV. Legislation May Be Appropriate to Address this Type of Inequity
This case is not unique in the sense that years after the sentence was imposed, it is recognized that the death sentence was inappropriate for the case. This Court has seen multiple instances in which, in the past, a person was sentenced to death but, due to the passage of time and changes in the law or understanding of the facts, the present state representatives believe the death sentence is unjust. This problem sometimes can be remedied through traditional habeas review when this Court determines that there is a meritorious constitutional claim that entitles the defendant to relief. But sometimes, as here, given this Court's majority order denying relief, the habeas review process is inadequate to reach a just result in the eyes of the defense, the state prosecutors, and the victim's family. A rare grant of clemency by the Texas Governor may attempt to correct the inadequacy of the habeas review process. But I conclude that there should be other avenues that would permit habeas relief from a death or other type of unjust sentence when the defense, prosecutors, and trial judge all agree that relief is appropriate and in the interests of justice.
Here, as evidenced by its agreement to permit a life sentence for applicant, the State no longer believes that the death penalty remains an appropriate punishment for this offense. And yet, as this Court has indicated, there currently exists no procedural mechanism or statute that would allow the parties to agree to reform a pending death sentence to any other punishment. Believing his death sentence to be finally invalidated through an agreement of the parties, applicant was moved off death row into the general prison population to serve a sentence of life imprisonment. But now, as a result of an absence of any statutory mechanism that would permit that agreement, applicant has been returned to death row to again await imposition of his death sentence. Given the rarity of grants of clemency, the current situation presents the real possibility that applicant would be executed even though the State no longer wishes to pursue that punishment against him.[2] Aside from the *258 potential constitutional concerns noted above, this situation runs counter to the public interest when, after a lengthy incarceration on death row, the State and the victim's family indicate that they no longer wish to pursue the yet-to-be-carried-out execution of the defendant.
To remedy this situation, the Legislature could consider enacting legislation that would permit a defendant and the State, with the consent of the victim's family, to enter into an agreed reformation of a capital murder judgment to reflect some punishment less than death. As the Supreme Court has stated, "the penalty of death is different in kind from any other punishment imposed under our system of criminal justice." Gregg , 428 U.S. at 188, 96 S.Ct. 2909. It is "unique in its severity and irrevocability." Id. at 187, 96 S.Ct. 2909. I conclude that, when there are serious questions about the facts supporting a conviction for capital murder or the appropriateness of a death sentence, and when the State, the defense, and the trial court agree that reformation of a death sentence to a lesser sentence is the appropriate and just resolution of the case, there should be a mechanism under the law, aside from clemency, that permits such a reformation.
V. Conclusion
I would remand applicant's false-evidence claim for a new hearing in the habeas court, and I would consider the merits of the arguments presented in his motion to remand asserting that executing him under these particular circumstances would violate the federal Constitution. I, therefore, respectfully dissent.

See Tex. Code Crim. Proc. art. 32.02 ("The attorney representing the State may, by permission of the court, dismiss a criminal action at any time upon filing a written statement with the papers in the case setting out his reasons for such dismissal, which shall be incorporated in the judgment of dismissal. No case shall be dismissed without the consent of the presiding judge.").

With respect to executive clemency, I note here that clemency has been granted in Texas only in the very rare case. In August 2013, the Capital Punishment Assessment team noted that, as of that time, Texas had executed 503 inmates in the modern death penalty era and had commuted the sentences for only two inmates facing imminent execution. See Capital Punishment Assessment Highlights, Clemency, Chapter 9, available at http://www.txcourts.gov/media/415483/ABATXCapitalPunishmentAssessmentHighlights.pdf. In the period since that report was issued, I am aware of only one additional inmate who has been granted clemency. Given the rarity of grants of clemency, the hypothetical availability of this remedy should not weigh against the policy considerations that favor the enactment of legislation in this area.